| | | |
|---|---|---|
| ROSALINDA ALBRIGHT, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.: |
| v. | ) ) | Judge |
| THE SHERWIN-WILLIAMS COMPANY, THE SHERWIN-WILLIAMS MANUFACTURING COMPANY, USA SHERWIN-WILLIAMS CHEMICAL INDUSTRY GROUP, INC, and USA SHERWIN-WILLIAMS CHEMICAL LLC | ) ) ) ) ) ) ) | CLASS ACTION COMPLAINT  JURY TRIAL DEMANDED |
| Defendants. | ) ) ) ) ) | |

Plaintiff Rosalinda Albright ("Plaintiff"), brings this action against Defendants The Sherwin-Williams Company, The Sherwin-Williams Manufacturing Company, USA Sherwin-Williams Chemical Industry Group, Inc. and USA Sherwin-Williams Chemical LLC (collectively, "Defendants"), on behalf of herself and all others similarly situated, and allege the following based on information and belief, except as to allegations specifically pertaining to Plaintiff, which are made upon personal knowledge.

## NATURE OF THE CASE

1.      Plaintiff brings this Complaint on behalf of a nationwide and an alternative state sub-class ("Class members") of all similarly situated purchasers of Defendants' Duckback Deck & Dock Elastomeric Coating and Deck and Dock Solid Coating ("Duckback) and SuperDeck Deck

and Dock Coating ("SuperDeck") ("collectively referred to herein as the "Products").  Despite knowing that the Products are defective, Defendants marketed, sold, and continue to sell them to millions of unsuspecting consumers.

2.     Defendants market and sell the Products as do-it-yourself products for use by consumers hoping to save time and money by repairing and revitalizing—rather than replacing— their existing decks and docks by covering the surface with a thick, weather-resistant coating. Indeed, Defendants market the Products specially for use "on old badly damaged decking [as] an effective alternative to the costly expense of deck replacement."[1]

3.     Defendants market the Products as being premium quality and all-in-one products capable of resurfacing, sealing, and waterproofing surfaces. Defendants further claim the Products can be applied by homeowners ("easy to use, just clean deck or patio surface and apply with a roller"); protect, resurface, and repel water on old damaged wood and concrete; lock down splinters and bridge dimensionally unstable cracks on old damaged wood surfaces; are formulated to resist growth of mildew and algae on the coating's surface; and provide long-lasting protection against moisture and the damaging effects of the sun (providing "weatherproofing protection").[2]

4.     Defendants claim is the Products are "designed to expand and contract along with the substrate while offering excellent scuff resistance for heavy duty foot traffic areas," such that

---

[1] https://www.SuperDeck.com/product/deck-dock-high-build-coating-3100/ (last visited November 30, 2017).

[2] https://www.sherwin-williams.com/homeowners/products/SuperDeck-exterior-deck-dock-coating (last visited November 30, 2017).

the Products will not crack or peel following application.[3]  But contrary to Defendants'

representations and illusory guarantees and warranties, the Products are plagued by design flaws

that invariably result in peeling, cracking, and bubbling once exposed to the elements, all of which

ultimately expose the underlying surface to environmental conditions that further degrade the

remaining coating, as well as the surface to which it is applied.

5.  Despite longstanding knowledge of the Products' inherently defective nature,

Defendants continue to manufacture, market, and sell them to the public—and make

misrepresentations and illusory guarantees and warranties—while leaving consumers to shoulder

the substantial removal and replacement costs required to return surfaces to their original condition

once the Products invariably fail.  But for Defendants' many misrepresentations and omissions,

Plaintiff and Class members would not have purchased the Products and would not have suffered

the damages alleged herein.

6.  Accordingly, Plaintiff brings this class action seeking actual and punitive damages,

injunctive relief, costs, and attorneys' fees, to hold Defendants' accountable for the unfair,

deceptive, untrue, and misleading advertising described herein.

PARTIES

*Plaintiff Rosalinda Albright*

7.  Plaintiff Rosalinda Albright resides in Willard, Missouri. In August 2015, Ms.

Albright purchased from a Sherwin-Williams store in Springfield, Missouri several cans of both

SuperDeck and Duckback . Before making her purchase, Albright viewed and reasonably relied

---

[3] https://www.SuperDeck.com/product/deck-dock-high-build-coating-3100/ (last visited November 27, 2017).

upon Defendants' advertising claims concerning the Products' high quality and long-lasting protection. She did not know that SuperDeck and Duckback were defective before her purchase. The Products were applied to Albright's decks in accordance with Defendants' instructions, yet deteriorated within months of application. Albright suffered injury in fact and lost money and property as a result of the unfair, deceptive, untrue, and misleading advertising described here. Had Albright known of the Products' defective nature, she would not have purchased them.

*Defendants*

8.　　Defendant The Sherwin-Williams Company is an Ohio corporation with its principal place of business in Cleveland. The Sherwin-Williams Company is a multinational company with subsidiaries that manufacture and market high-performance coatings, sealants, and specialty chemicals, primarily for maintenance, repair, and improvement applications, including SuperDeck,[4] and both Duckback Deck & Dock Elastomeric Coating and Duckback Deck and Dock Solid Coating. The Sherwin-Williams Company oversees the work of Defendants The Sherwin-Williams Manufacturing Company, USA Sherwin-Williams Chemical Industry Group, Inc., and USA Sherwin-Williams Chemical LLC, including designing, manufacturing, and purposefully causing the Products to be placed into the stream of commerce within this District and throughout the United States. At all times relevant here, The Sherwin-Williams Company was, and is, the parent company of The Sherwin-Williams Manufacturing Company, USA Sherwin-Williams Chemical Industry Group, Inc., and USA Sherwin-Williams Chemical LLC.

9.　　Defendant The Sherwin-Williams Manufacturing Company is a subsidiary of Defendant The Sherwin-Williams Company and manufactures protective paints and coatings for

---

[4] http://the-dsa.com/sherwin-williams-announces-enhancements-to-SuperDeck-products/ (last visited November 30, 2017).

home and industry use. The Sherwin-Williams Manufacturing Company is a corporation organized and existing under the laws of Ohio with its principal place of business in Cleveland, Ohio. The decisions, acts and omissions alleged here were conceived by, implemented, and at all times carried out by Defendant The Sherwin-Williams Manufacturing Company, directly or in concert with Defendant The Sherwin-Williams Company.

10.     Defendant USA Sherwin-Williams Chemical Industry Group, Inc. is a subsidiary of Defendant The Sherwin-Williams Company and manufactures protective paints and coatings for home and industry use. USA Sherwin-Williams Chemical Industry Group, Inc. is a corporation organized and existing under the laws of Ohio with its principal place of business in Cincinnati, Ohio. The decisions, acts, and omissions alleged here were conceived, implemented, and at all times carried out by Defendant USA Sherwin-Williams Chemical Industry Group, Inc, directly or in concert with Defendant The Sherwin-Williams Company.

11.     Defendant USA Sherwin-Williams Chemical LLC is a subsidiary of Defendant The Sherwin-Williams Company and manufactures protective paints and coatings for home and industry use. USA Sherwin-Williams Chemical LLC is a corporation organized and existing under the laws of Ohio with its principal place of business in Cleveland, Ohio. The decisions, acts, and omissions alleged here were conceived, implemented, and at all times carried out by Defendant USA Sherwin-Williams Chemical LLC, directly or in concert with Defendant The Sherwin-Williams Company.

12.     Defendants used, commingled, and combined their resources to design, develop, manufacture, market, and sell the Products.

13.     At all times relevant here, the Defendants were actual or *de facto* joint venturers in the design, development, manufacture, marketing, and sale of the Products.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction according to 28 U.S.C. § 1332(d)(2). The matter

in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a

class action in which Plaintiff is a citizen of a state different from Defendants. Further, greater than

two-thirds of the Class members reside in states other than the state in which Defendants are

citizens.

15.     This Court has personal jurisdiction over Defendants because they have conducted

substantial business in this judicial district, and intentionally and purposefully placed the Products

into the stream of commerce within the districts of Ohio and throughout the United States.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because

Defendants transact business in this district, are subject to personal jurisdiction in this district, and

therefore are deemed to be citizens of this district.  In addition, Defendants have advertised in this

district and have received substantial revenue and profits from the sale of the Products in this

district, including to Plaintiff Albright and other members of the Class; therefore, a substantial part

of the events and/or omissions giving rise to the claims occurred, in part, within this district.

## FACTUAL ALLEGATIONS

17.     Defendants are leading manufacturers and sellers of protective paints and coatings

for home and industrial use. Their products include home and industrial coatings, decorative

fashion paints, primers, stains, and wood/concrete finishes and protective coatings.[5]

---

[5]https://www.sec.gov/Archives/edgar/data/89800/000119312517156507/d369433d424b5.htm#supptx369
433_4 (last visited November 30, 2017)

18.    As is known in the industry, consumers purchasing wood and concrete coating products for their homes want products that will withstand harsh weather conditions and maintain their aesthetic appeal. With a large variety of wood and concrete surface coating products available in the market place, manufacturers must innovate to distinguish themselves from their competition.

***The Development, Marketing and Sale of the Duckback Product***

19.    To distinguish itself in the marketplace, in July 2013, Duckback—then a subsidiary of Consorcio Comex, S.A. de C.V. ("Comex"), an architectural and industrial coatings company formerly headquartered in Mexico City, Mexico—released SuperDeck Deck & Dock Elastomeric Coating.



20.    In a press release announcing its newest offering, Duckback asserted that its elastomeric coating was "the perfect choice to refinish old and damaged wood, composite and

concrete surfaces instead of total replacement,"[6] thus enticing consumers with worn and weathered decks to pay a premium price for a product purportedly capable of extending the life of their decks. Defendants further warranted the product[7] as follows:

- The flexible elastomeric formula withstands extreme climates and temperature changes; it expands and contracts with the surface instead of peeling or cracking;

- Easy to apply with soap and water clean up, and low maintenance;

- Contains a powerful mildewcide, plus UV protection for long lasting color;

- The high build formula fills dimensionally unstable cracks up to 1/4″ on extremely damaged surfaces; and

- "Splinterlock" technology locks down wood splinters for safer walking surfaces.

21.    At or around the time of product launch, Duckback's website[8] also claimed that "Deck & Dock can save these old surfaces by filling in cracks, so you can revive your decks and docks without the cost of total replacement[,]" and made similarly misleading claims concerning the Products' performance properties:

- Easy to use formula fills cracks, locks down splinters, restores, resurfaces and waterproofs all in one product;

- High build, flexible elastomeric formula;

---

[6] https://extremehowto.com/duckback-products/ (last visited November 30, 2017).

[7] *Id.*

[8] https://web.archive.org/web/20130827215141/http://www.SuperDeck.com:80/product/265/34/deck-dock-elastomeric-coating-3100/ (archived November 27, 2013).

- Fills dimensionally unstable cracks up to 1/4";

- "Splinterlock" technology; and

- Maximum hide with color retention.

22.    Defendants' present-day website [9] makes similar (and likewise deceptive) marketing claims:

- High-build elastomeric coating designed to protect, resurface and waterproof old, damaged wood and concrete.

- Unique formula provides long-lasting protection against moisture and the damaging effects of the sun.

- Designed to expand and contract along with the substrate while offering excellent scuff resistance for heavy duty foot traffic areas.

- Locks down splinters and bridges dimensionally unstable cracks on old damaged wood surfaces.

- Can be used on new wood, old wood, or concrete.

- Use over existing exterior paint or stained surfaces.

- Formulated to resist growth of mildew and algae on the coating's surface.

23.    Defendants also made similarly deceptive claims concerning Duckback in promotional videos, particularly concerning the Product's fitness for use in "extreme climates" and as an alternative to deck replacement.  In one such video,[10] Defendants apply the Product to a

---

[9] https://www.SuperDeck.com/product/deck-dock-high-build-coating-3100/ (last visited November 27, 2017).

[10] https://www.youtube.com/watch?v=sDbqwY8C_EA (last visited November 30, 2017).

"damaged" and "severely distressed" wood deck in order to demonstrate how the Product "will restore this surface, making it usable for years to come."  In that video, Defendants also claim that Duckback:

- Can be used to "restore" a deck rather than "replac[e]" it, "making it usable for years to come"

- Is "easy to use …."

- "will fill these cracks and bridge the wood, adding years of life to this deck"

- Provides a "beautiful and long-lasting finish"

- Utilizes an "elastomeric formula [that] will bend and stretch with the movement of the deck boards.  [Duckback] is perfect for extreme climates; the coating will not crack or peel. It's your one time product offering years of protection."

24.    Defendants' labels also build upon these themes.  The label appended to the Duckback claims that:

- "SplinterLock Technology Locks Down Splinters"

- The Product provides "Maximum Hide"

- "For Extremely Damaged Wood or Concrete"

- High-build flexible coating designed to protect, resurface, and waterproof old, damaged wood and concrete.

- Unique formula provides long-lasting protection against moisture and the damaging effects of the sun.

- Designed to expand and contract along with the substrate while offering excellent scuff resistance for heavy duty foot traffic areas.

- Can be used on new wood, old wood, or concrete.

- Use over existing exterior paint or stained surfaces.

- Formulated to resist growth of mildew and algae on the coating's surface

25.     In September 2013, Defendants acquired Comex's US and Canadian operations, including Duckback.  Defendants continued to manufacture, market, sell and warrant Duckback , and still do so today.

26.     Sometime thereafter, in or around late 2016 or early 2017, Defendants also introduced Duckback Deck & Dock Solid Coating with Cool Feel Technology.  On information and belief, the Duckback Solid Coating is functionally identical to the Deck & Dock Elastomeric Coating, save for the presence of chemical ingredients that purportedly reduce surface temperatures.



27.    Defendants market both Duckback products in identical fashion.  The Duckback website[11] makes the following false and misleading claims concerning the Solid Coating:

- High-build flexible coating designed to protect, resurface, and waterproof old, damaged wood and concrete.

- Unique formula provides long-lasting protection against moisture and the damaging effects of the sun.

- Designed to expand and contract along with the substrate while offering excellent scuff resistance for heavy duty foot traffic areas.

- Can be used on new wood, old wood, or concrete.

- Use over existing exterior paint or stained surfaces.

- Formulated to resist growth of mildew and algae on the coating's surface

***Defendants' Development, Marketing and Sale of Sherwin-Williams SuperDeck***

28.    Sometime during 2015, Defendants also began to market, sell and warrant the Product under the Sherwin-Williams brand name, through its exclusive "SuperDeck" line.[12]  The Sherwin-Williams Product is identical to the Duckback-brand Product.

29.    Defendants tout the durability, longevity, and low maintenance qualities of its SuperDeck product line, generally. Karl Schmitt, Senior Vice President of Market Research, Color and Design, publicly stated in 2016, "Since its initial launch last year, SuperDeck has offered our

---

[11] https://www.SuperDeck.com/product/deck-dock-cool-feel-5400/ (las visited November 27, 2017).

[12] Publicly available sources suggest Defendants' introduced Superdeck to market in early 2016. *See* https://www.coatingsworld.com/issues/2016-03-01/view_breaking-news/sherwin-williams-enhances-its-SuperDeck-finishing-system/7878 (last visited November 30, 2017).  However, Plaintiff purchased the Product from a Sherwin-Williams store in August 2015.

customers long-lasting results, durability and adhesion for any deck-related project."[13] In 2015, Mr. Schmitt publicly stated "SuperDeck is the most complete line in the industry for finishing both wood and composite decks, offering homeowners easy application, fast drying time and incredible durability." He further stated "Whether they are used for staining a new deck or restoring an old one, these products allow homeowners to complete projects faster with results that last longer without sacrificing quality or beauty."[14]

30.     In a press release announcing SuperDeck, Defendants claimed the Product is "[i]deal for smoothing and filling rough or damaged surfaces, [because] this coating will adhere to weathered wood and concrete[,]" and  capable of filling "up to 1/8-inch wide cracks."[15] SuperDeck is pictured below:

---

[13] https://www.coatingsworld.com/issues/2016-03-01/view_breaking-news/sherwin-williams-enhances-its-SuperDeck-finishing-system/7878 (last visited November 27, 2017)

[14] https://press.sherwin-williams.com/press/consumer/releases/2015/deck-care-system/ (last visited November 27, 2017)

[15] https://press.sherwin-williams.com/press/trade/releases/2016/SuperDeck-enhancements/ (last visited November 30, 2017).



31.     Defendants market SuperDeck just as they do Duckback.  Defendants claim that SuperDeck fills cracks up to 1/4" and provides an extremely durable surface that resists fading and creates a mildew resistant coating while giving new life to consumers' wood decking or concrete.  Defendants further describe their Product as "[a] high build coating designed to protect, resurface and repel water on old damaged wood and concrete[,]" that also helps to "bridge dimensionally unstable cracks on old damaged sound wood surfaces" without cracking and peeling, and "smooth rough wood and concrete surfaces."  In addition, Defendants describe SuperDeck as "[e]asy to use, just clean deck or patio surface and apply with a roller."[16]

---

[16] https://www.sherwin-williams.com/homeowners/products/SuperDeck-exterior-deck-dock-coating#product-details (last visited November 30, 2017).

32.    Defendants also produced various videos promoting SuperDeck's purported durability and performance attributes, while making claims substantially identical to those made with respect to Duckback. One of Defendants' promotional videos[17] claims that SuperDeck:

- "gives new life to weathered wood planks"

- "helps lock down small surface splinters"

- Results in an "opaque, uniform finish" sold by a manufacturer with a "premium reputation for quality"

***SuperDeck Does Not and Cannot Perform as Advertised***

33.    Defendants advertised that the Products were long-lasting, reliable, and worry free. Defendants' representations lead reasonable consumers to believe that the Products are premier and superior, and accordingly, Defendants have charged, and continue to charge, premium prices for the Products.

34.    Defendants' representations induced customers into purchasing the Products, and give consumers a false belief that the Products are long lasting and that Defendants will stand behind their representations.

35.    But Defendants' representations about the quality, durability, and longevity of the Products are false and materially misleading. Defendants had actual notice that the Products are of inferior quality and prone to fail prematurely, and that the Products do not provide lasting results, even when applied properly in accordance with Defendants' instructions.

36.    The Products instead crack, chip, peel, and otherwise fail prematurely—especially in weather conditions Defendants advertise the Products as capable of withstanding.

---

[17] https://youtu.be/qB9C9u3TbxQ (last visited November 27, 2017).

37.     Unlike penetrative stains that actually soak into wood and other surfaces in order to tint and protect substrates from moisture and harsh environmental conditions, is the Products are film forming finishes similar to paint. Film forming finishes should not be used on decking surfaces due to the inherent characteristics of wood decking and the environmental conditions to which such substrates are exposed.

38.     Exterior wooden substrates are subjected to repeated wet-dry and freeze-thaw cycles that cause shrinking and swelling of the decking material, as well as aggressive sunlight, UV degradation, and repeated foot traffic and abrasion. Due to these harsh conditions, a film forming finish will inevitably crack when applied to a wooden substrate, Defendants' false and deceptive claims to the contrary notwithstanding. Once the film cracks, moisture penetrates into the wood substrate below the paint film and results in cracking and peeling, and, eventually, wood decay. For these reasons, film-forming finishes are not recommended for use on any decking surface. Indeed, the USDA's Forest products Laboratory—experts in the field of wood sciences—do not recommend film forming finishes for application to exterior wooden substrates, [18] and cannot estimate an expected service life therefor:

---

[18] Wood Handbook, Wood as an Engineering Material. 2010. Centennial Edition. United States Department of Agriculture, Forest Service, Forest Products Laboratory. General Technical Report, FPL-GTR-190, at Table 16-4.

**Table 16–4. Suitability and expected service life of finishes for exterior wood surfaces[a]**

| Type of exterior wood surface | Tinted finishes such as deck finishes — Suitability | Tinted finishes such as deck finishes — Expected service life[b] (years) | Semitransparent stain — Suitability | Semitransparent stain — Expected service life[c] (years) | Paint and solid-color stain — Suitability | Paint and solid-color stain — Expected service life[d] (years) — Paint | Paint and solid-color stain — Expected service life[d] (years) — Solid-color stain |
|---|---|---|---|---|---|---|---|
| **Siding** | | | | | | | |
| Cedar and redwood | | | | | | | |
|   Smooth (vertical grain) | Low | 1–2 | Moderate | 2–4 | High | 10–15 | 8–12 |
|   Smooth (flat grain) | Low | 1–2 | Moderate | 2–4 | Moderate | 8–12 | 6–10 |
|   Saw-textured | High | 2–3 | High | 4–8 | Excellent | 15–20 | 10–15 |
| Pine, fir, spruce | | | | | | | |
|   Smooth (flat grain) | Low | 1–2 | Low | 2–3 | Moderate | 6–10 | 6–8 |
|   Saw-textured (flat grain) | High | 2–3 | High | 4–7 | Moderate | 8–12 | 8–10 |
| Shingles (sawn shingles used on side-walls) | High | 2–3 | High | 4–8 | Moderate | 6–10 | 6–8 |
| **Plywood** | | | | | | | |
| Douglas-fir and Southern Pine | | | | | | | |
|   Sanded | Low | 1–2 | Moderate | 2–4 | Moderate | 4–8 | 4–6 |
|   Saw-textured | Low | 2–3 | High | 4–8 | Moderate | 8–12 | 6–10 |
| MDO plywood[e] | — | — | — | — | Excellent[f] | 12–15 | 10–15 |
| Hardboard, medium density[g] | | | | | | | |
|   Unfinished | — | — | — | — | High | 8–12 | 6–10 |
|   Preprimed | — | — | — | — | High | 8–12 | 6–10 |
|   MDO overlay | — | — | — | — | Excellent[f] | 10–15 | 10–15 |
| **Decking** | | | | | | | |
| New (smooth-sawn) | High | 1–2 | Moderate | 2–3 | Low | — | — |
| Weathered or saw-textured | High | 2–3 | High | 3–6 | Low | — | — |
| Oriented strandboard | — | — | Low | 1–3 | Moderate | 4–5 | 4–5 |

[a]Estimates were compiled from observations of many researchers. Expected life predictions are for average location in the contiguous USA; expected life depends on climate and exposure (such as desert, seashore, and deep woods).
[b]The higher the pigment concentration, the longer the service life. Mildew growth on surface usually indicates the need for refinishing.
[c]Smooth unweathered surfaces are generally finished with only one coat of stain. Saw-textured or weathered surfaces, which are more adsorptive, can be finished with two coats; second coat is applied while first coat is still wet.
[d]Expected service life of an ideal paint system: three coats (one primer and two top-coats). Applying only a two-coat paint system (primer and one top-coat) will decrease the service life to about half the values shown in the table. Top-quality latex top-coat paints have excellent resistance to weathering. Dark colors may fade within a few years.
[e]Medium-density overlay (MDO) is painted.
[f]Edges are vulnerable to water absorption and need to be sealed.
[g]Water-repellent preservatives and semitransparent stains are not suitable for hardboard. Solid-color stains (latex or alkyd) will perform like paints. Paints give slightly better performance because the solids content of paint is higher than that for solid-color stains and thus paints give greater film build for the same volume of finish used.

39. Defendants' instructions also are inadequate. Prior to the application of any film forming finish to a wood product used in an exterior application, all previous finishes *and* weathered wood need to be scraped, sanded and cleaned thoroughly. Scraping removes loose and old finishes. Sanding removes any additional loose finishes and weathered wood, while sanding with 50 to 80 grit sand paper also roughens the surface of the wood, which is necessary to ensure good mechanical adhesion of a film forming finish. By failing to instruct Class members to prepare their decks accordingly, Defendants virtually guaranteed the Products would fail to adhere to the severely weathered wood decks to which they claimed the Products would bring new life.

40. Despite their knowledge of these defects, Defendants continue to market the Products as top of the line, while masking their inferiority. Purchasers of the Products, including Plaintiff, make purchasing decisions in reasonable reliance upon the information Defendants and their authorized dealers provide on websites and in marketing literature, advertisements,

guarantees, and warranties. Indeed, Defendants' representations about the Products' sole and exclusive purpose—a resurfacer for damaged decks and an alternative to deck replacement—were necessarily the reason purchasers' bought these products.

41.     Defendants made each of the above-described assertions, statements, representations, and warranties with the intent and purpose of inducing suppliers, builders, and consumers to purchase and apply the Products in residential and commercial structures throughout the United States. But Defendants knew and (know) that these misrepresentations are untrue, and that the Products are defective and cannot perform as promised.

42.     Defendants knowingly and intentionally conceal and fail to disclose that— notwithstanding statements on their websites, brochures, advertisements, product labels, guarantees, and warranties—the Products routinely fail within months after proper installation, far in advance of the advertised time that the Products are supposed to last.  Indeed, that the Products have deteriorated at such a rapid rate (and will continue to do so) demonstrates their lack of durability and resiliency.

43.     Defendants also made numerous material omissions in relevant advertisements and marketing materials, and uniformly withheld important information relating to the design, reliability, and performance of the Products, particularly insofar as the Products prematurely chip, peel, and flake, do not provide long-term waterproofing protection, are not sufficiently flexible to withstand changes in temperature, and thus are inherently defective and unsuited for their ordinary and intended purpose.

44.     Defendants have had notice of the deficiencies described herein and have been repeatedly notified by customers that the Products are defective and do not perform as advertised.

45.     Had Defendants not withheld and omitted important information about the design, reliability, and performance of the Products, Plaintiff and the Class, as reasonable consumers, would not have purchased or installed them, nor would they have paid the exorbitant prices that they did.

***Defendants' Warranties Fail of their Essential Purpose***

46.     Since bringing Duckbackto market, Defendants and their predecessors promised consumers that "[i]f [the Duckback], when applied according to label instructions to a properly prepared surface, fails to perform to your complete satisfaction for as long as you own your home, manufacturer shall, upon presentation of proof of purchase to manufacturer or its authorized representative, either replace an equivalent quantity of product free of charge or refund the original purchase price."

47.     Defendants similarly warranted the SuperDeck: "[i]f [SuperDeck], when applied according to label instructions to a properly prepared surface, fails to perform to your complete satisfaction for as long as you own your home, The Sherwin-Williams Company shall, upon presentation of proof of purchase to the store where the product was purchased, either replace an equivalent quantity of product free of charge or refund the original purchase price."

48.     As the warranties plainly reveal, Defendants expect SuperDeck to provide protection for as long as consumers own their home.  Indeed, Defendants even claim that Class members need only "[a]pply one new coat of Deck & Dock Elastomeric Coating every 5–7 years to a clean surface to renew color and maintain durability."[19] Consumers likewise reasonably

---

[19] https://www.SuperDeck.com/product/deck-dock-high-build-coating-3100/ (last visited November 30, 2017).

expected the Products to last for years, if not for as long as they own their home, and for it not to fail within months of application.

49.     Once the Products fail—thereby breaching Defendants' warranties—Class members have no choice but to remove the Products from their deck at considerable expense in order to return their properties to their original condition.  Defendants' warranty limitations, including any remedial limitations and exclusions concerning implied warranties, thus fail of their essential purpose and are unconscionable.

50.     Defendants also knowingly and intentionally concealed and failed to disclose to Plaintiff and Class members that they had no intention of honoring their guarantee of satisfaction or warranty, and that they routinely fail to honor their commitments when consumers notify them of the deterioration or failure of the Products as reflected in the exemplar consumer complaints cited below.

***Internet complaints about the Products are rampant.***

51.     Many customers have complained about the low quality and premature failure of the Products. The following represent a very small sampling of Internet postings by purchasers reflecting their frustrations and dissatisfaction with the Products:

> **Consumer No. 1 (November 8, 2014):**
> Believe all the other 1-star ratings for this company's products. Worse than a waste of time and money because it will need to be removed before you use a good product.[20]

---

[20] https://www.amazon.com/gp/customer-reviews/R2HKE82XSRY9GX/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=B00828ID0G (last visited November 30, 2017).

**Consumer No. 2 (April 19, 2014):**

I bought this product to cover an older deck and a new one. Bought at a paint store. They told me I needed to prime wood first with an oil based primer. Did as directed. Cleaned wood first, dried completely, applied primer, dried, applied deck and dock. Was not even a year before I could see it peeling up. I called the number on the can to find out what went wrong. The rep. said I didn`t need to prime first. So we rented a sander and it took off most of the peeling paint plus the primer. We started all over again, minus the primer.

Again, the same thing happened! Even the parts of the deck that does not get any foot traffic was blistering and coming off. The second time we applied it, we made sure that weather conditions were favorable, that it was dry, etc. We bought this product because I am sensitive to the smell of the oil based paints. I now wished we would have used an oil based stain so I would avoid this frustration. What is even worse, is that now we can`t put an oil based over a water based paint unless we sand it all off again.

This is the first time I have written a review because I have spent so much time, money and effort on this project only to have to do it again, and the same thing happens! I hope if you choose to use this product, you will have better luck.[21]

**Consumer No. 5 (January 15, 2017):**

We used the Sherwin Williams Super Deck Duckback brand and had it professionally installed. The deck was 8 years old and we wanted to change the color. We had some questionable boards replaced to make sure the deck would be good for another 8 years. One year after we installed we noticed black mold appearing and some boards starting to rot, then a few months later some boards were rotting all the way through. This product is terrible, had the installer and a SW rep come and inspect and say they aren't going to do anything, although they did say they made the formula better now![22]

---

[21] https://www.amazon.com/gp/customer-reviews/R22AMDC6NGU58Z/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=B00828ID0G (last visited November 30, 2017).

[22] http://topcoatreview.com/2015/06/old-pressure-treated-decks (posted by "Rob D").

**Consumer No. 6 (October 7, 2016):**

My husband applied this SW product last year, but it didn't hold up at all. It hasn't peeled; it just looks really weathered. I am unconvinced that my husband prepared the surface properly–he did pressure wash, but I don't think that he used any kind of cleaner. I also don't think he applied the product in a thick enough coat. Previously, I believe he used Thompson's sealer, not a stain. What kind of surface prep do we need to do to see whether we can make this work for us? Or should we give up and try something else? I think i have attached a photo![23]

**Consumer No. 7 (July 21, 2016):**

We have painted our deck with Deck and Dock Elastomeric coating, after a couple of years the paint started to peel. We have sanded , scraped, power wash, and deck wash the deck, most o the loose paint has been removed leaving some paint intact, heavy duty sanding will not remove . . . .[24]

**Consumer No. 8 (October 23, 2017):**

The first time my wood deck was sealed the contractor used a Sherwin Williams transparent product that was a total failure. Neither SW nor the contractor would take responsibility. The second time SW Super Deck & Dock Elastomeric Coating was used. Also bad results. SW now tells me I MUST use the Elastomeric product to redo. That no other product will work. Lowe's and Home Depot reps have no idea. Can you suggest a solution? Thanks.[25]

**Consumer No. 9 (August 25, 2017):**

This product is defective. Within 3 months of being applied to 4 decks at my home, the stain started coming up in sheets everywhere. My contractor up until now had been using Sherwin Williams products exclusively for 30 years. Photos were taken of the mess, samples were sent to a lab, a regional rep came to the house. Sherwin Williams refused to own their problem and was absolutely no help! The decks had to be stripped and sanded down. We applied a competing brand with the assurance from the brand manager that they would guarantee the stain and if we had any problem they

---

[23] Posted at *id.* by "mindy".

[24] Posted at *id.* by "Dale Warriner".

[25] https://www.deckstainhelp.com/SuperDeck-stain-review/ (posted by "Sally McLaughlin").

would make it right. I split the cost of labor with my contractor so that he wasn't out 25 hours of work redoing what Sherwin Williams wrought on the exterior of my home. Between the contractor and myself we paid for this job twice.[26]

**Consumer No. 10 (May 27, 2017):**
My deck is 15 years old and had been done a few times with Cabot stains. We wanted to change the color and hired a pro painter to do our deck and porch. The Deck was getting a color change and also gets weathered so we asked the painters advice and they recommended this because it will fill in small cracks and such and be more durable. Well wrong, wrong wrong. The painters rolled it too thins and as it is a thick product it never filled in many of the smaller cracks and in left a varied finish on the deck where you can tell the difference in thickness. It looks bad, and because of the way it sits I find it hard to believe that this stuff won't just chip and peel off in a few months after a few bouts of rain and sun and then once winter comes and this stuff expands and contracts I bet I will be redoing this deck far sooner than I ever had to with the previous brand stain that was on the deck for 15+ years. This is the second SW product I am disappointed in, but for whatever reason the painters around here use SW. Next time I will pay extra to use the products I want to use.[27]

**Consumer No. 11 (January 24, 2017):**
We wanted to update our deck color and chose this product, BIG MISTAKE! Our deck was just 8 years old and had it professionally applied. We chose to replace some potentially bad boards to make sure we were good to go. At first product looked great, but about 12 months into the makeover, boards began to rot through and black mold coming from the paint. WOULD NOT RECOMMEND![28]

**Consumer No. 12 (February 20, 2017):**
I used this product on our 5 year old deck 2 years ago. Within a year the coating was peeling and the hardware started rusting. Black mold was forming through the paint. Caused the treated wood to rot.

---

[26] https://www.sherwin-williams.com/homeowners/products/SuperDeck-exterior-deck-dock-coating#ratings-and-reviews Posted by "Zoe" on August 25, 2017.

[27] Posted at *id.* by "keithl".

[28] Posted at *id.* by "RSD".

It doesn't seal any cracks. Now I'm having to strip the paint from the deck. What a mess. I highly discourage anyone from using this product.[29]

**Consumer No. 13 (September 26, 2017):**
Will not hold up to any weather conditions. Contains Linseed oil which is a feeder for mold and mildew, terrible application, and Will Not last. Don't believe the reviews about the problem being consumers not following application direction, they are paid for those reviews and is a fake. Research other review sites. Terrible product!![30]

**Consumer No. 14 (August 10, 2014):**
Peeled after two weeks, all it took was a grass sprinkler turned on the surface of the deck for nine hours. When I called Duckback customer service they insisted I applied the stain wrong. I followed application instructions both online and on the back of the can. Do not, I repeat buy this product, you'll regret it. TOTAL GARBAGE!!!!!!!.[31]

**Consumer No. 15 (July 13, 2016):**
A professional contractor pressure-washed my deck and applied this expensive product (color gray) purchased from a local building supply store, to my seaside deck that was old with peeling stain but not obviously rotting. The new coating lasted for two years but is now peeling away in large pieces (fun to remove but with obvious downsides). It seems to have held moisture in the wood and we now have many rotting boards that need to be replaced. I definitely do not recommend this product.[32]

**Consumer No. 16 (October 10, 2016):**
This product is garbage. DO NOT WASTE YOUR MONEY!! Have reapplied this product twice, following directions to the letter. Both times, after a few months, it bubbled and peeled in large strips. The

---

[29] Posted at *id.* by "Bob".

[30] Posted at https://www.amazon.com/Duckback-Products-SC-3104-4-Elasto-Coating/dp/B00828ITF0 by "Amazon Customer.

[31] Posted at *id.* by "marty".

[32] Posted at *id.* by "SandyC".

second time I reapplied, I actually pressure washed, let dry, sanded (to rough the wood) used an oil based primer, and coated. Within 6 months, it was coming up in places. Decided to clean the rest of the deck and with light brushing and hose spray, the coating came up in sheets. I have a 1500 sq. foot deck. This is not only a tremendous waste of money, but time as well.[33]

52.     As referenced above, consumers have also taken their complaints directly to Defendants, expressing their frustration with the Products on Defendants' website.

***Plaintiff's experience with the Products.***

53.     In or about August 2015, Albright purchased the Products from a Sherwin-Williams. Before making her purchase, she viewed and reasonably relied upon the advertising claims made by Defendants regarding high quality and long-lasting protection. The Products were applied to both her patio deck and pool deck in August 2015, in full compliance with Defendants' application instructions.

54.     Several months later, the Products began to bubble and peel off from Albright's decks, causing extensive damage to the wood below:

---

[33] Posted at https://www.amazon.com/Duckback-Products-SC-3102-4-Elasto-Coating/product-reviews/B00828ID0G/ref?cm_cr_arp_d_viewopt_srt?ie=UTF8&reviewerType=all_reviews&sortBy=recent&pageNumber=1 by "Book worm".





55.     What started as small peeling and bubbling grew to peeling of strips that are several inches in length and involve considerable bubbling.

56.     Shortly after Plaintiff noticed the peeling she contacted Defendant to complain. Defendant sent a representative out to inspect her deck.  The representative applied additional product to a large area of the deck and told Plaintiff to go to the store to get more product to see if that would resolve the issues.  Plaintiff visited the Sherwin Williams store and was provided with more product which she applied.  However, the deck continued to peel in the area where the representative applied more product and where the Plaintiff applied more product.   The Defendant's representative acknowledged these same problems occurring even where professional contractors apply the product.

57.     As of the date of filing this Complaint, Plaintiff's home remains in disrepair as a result of the defective Products.

58.     Plaintiff and Class members have suffered damages as a result of Defendants' deceptive practices, including but not limited to the fact that the Products quickly deteriorate, are defective, and require repair and replacement—which has caused, or will cause, Plaintiff and Class members to incur material and labor costs. Additionally, as a result of the defective quality of the Products, Plaintiff and Class members have suffered damage to their homes where the Products were applied, diminishing the values of the affected homes. While these customers are forced to repair or replace Defendants' defective Products, Defendants has not reimbursed them for the costs associated with this work.

59.     The experiences and complaints of Plaintiff and Class members, and Defendants' acknowledgement thereof, show that Defendants were well aware of customer complaints and experiences concerning the defects in the Products. Despite this knowledge, Defendants have neither implemented changes to cure the defects associated with the Products nor their deceptive marketing campaign.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this class action under Federal Rule of Civil Procedure 23, on behalf of herself and all others similarly situated. The proposed Nationwide Class is defined as follows:

> All U.S. residents who, within the applicable statute of limitations, purchased Duckback or SuperDeck. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

61.     In the alternative, Plaintiff brings this class action on behalf of the following proposed Class ("the Missouri Class"):

> All Missouri residents who, within the applicable statute of limitations, purchased Duckback or SuperDeck. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

62.     Plaintiff reserves the right to redefine these Classes before class certification.

63.     Numerosity: The number of people who are class or subclass members is so numerous that joinder of all members in one action is impracticable. The Class consists of at least tens of thousands of consumers.

64.     Predominance: Questions of law or fact that are common to the entire class or subclasses predominate over individual questions because Defendants' actions were generally applicable to the entire class or subclasses. These legal and factual questions include, but are not limited to:

> a.      whether the Products are defective;

b.  whether Defendants knew or should have known of the defective nature of the Products;

c.  whether the Products failed to perform according to ordinary consumers' reasonable expectations;

d.  whether the Products failed to perform as Defendants warranted;

e.  whether Defendants' warranties, including their limitations, are unconscionable and unenforceable;

f.  whether Defendants knew and failed to disclose that Defendants did not intend to honor its warranties and routinely refuses to honor their warranties;

g.  whether Plaintiff and the classes suffered damages as a result of Defendants' conduct;

h.  whether Plaintiff and the classes are entitled to injunctive and declaratory relief; and

i.  whether Defendants were unjustly enriched and, if so, the measure of their enrichment.

65.  <u>Commonality</u>: All questions concerning Defendants' representations and publicly disseminated advertisements and statements are common. Determining Defendants' knowledge regarding the misleading and deceptive nature of their statements made and alleged here on websites, brochures, advertisements, product labels, and warranties will be applicable to all class and subclass members. Furthermore, whether Defendants violated any state laws and pursued the course of conduct complained of here or acted intentionally or recklessly in committing the conduct described here, as well as the extent of the appropriate measure of damages, injunctive and declaratory relief, and restitutionary relief, are questions common to the class or subclasses.

66.  <u>Typicality</u>: Plaintiff's claims are typical of those brought on behalf of the class members. Plaintiff purchased defective Products and the Products malfunctioned, failed, or otherwise proved defective shortly after installation or application. Plaintiff, like all class

members, has suffered damages associated with the use of the Products, including not only the premature failure of the Products but also damage to her home caused by moisture intrusion and exposure of the area covered with the Products.

67.     Adequacy of Representation: Plaintiff will fully and adequately represent and protect the interests of the class and subclasses because of class members' common injuries and interests and because of Defendants' singular conduct that is or was applicable to all of them. Plaintiff has retained counsel competent and experienced in prosecuting class action and consumer litigation. Plaintiff has no interests that are contrary to or in conflict with the interests of the class or subclasses they seek to represent.

68.     Superiority: A class action is superior to all other available methods for fair and efficient adjudication of this controversy. Plaintiff anticipates no difficulty in managing and maintaining this action as a class action.

69.     The prosecution of separate actions by individual class or subclass members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards of conduct for Defendants.

## CLAIMS FOR RELIEF

## COUNT I

### *Violation of the Magnuson-Moss Warranty Act*
### *(on behalf of the Nationwide Class or, alternatively, the State Subclasses)*

70.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully here.

71.     Congress enacted the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*., in response to widespread consumer complaints regarding misleading and deceptive warranties. The

Act imposes civil liability on any "warrantor" for failing to comply with any obligation under written and implied warranties. 15 U.S.C. § 2310(d)(1).

72.     The Products are a "consumer product," as defined by § 2301(1).

73.     Plaintiff, the Nationwide Class, and the State Subclass members are "consumers" as defined by § 2301(3).

74.     Defendants are "warrantors" and "suppliers" as defined by §§ 2301(4) and (5).

75.     Defendants have failed to remedy the Products' propensity to prematurely fail, despite Defendants' knowledge and notice of the Products' propensity to prematurely crack, peel, flake, chip, bubble, pucker, separate, delaminate, discolor, and generally degrade shortly after application, as well as the Products' propensity to cause damage to decks and other property.

76.     Defendants' Products labels promise and expressly warrant that they: "[l]ock[] [d]own [s]plinters"; provide "[m]aximum [h]ide"; are specifically intended for application on "[e]xtremely [d]amaged [w]ood or [c]oncrete"; are "[h]igh-build flexible coating[s] designed to protect, resurface, and waterproof old, damaged wood and concrete"; provide "long-lasting protection against moisture and the damaging effects of the sun"; are "[d]esigned to expand and contract along with the substrate while offering excellent scuff resistance for heavy duty foot traffic areas" and "[f]ormulated to resist growth of mildew and algae on the coating's surface"; and can be applied "over existing exterior paint or stained surfaces."

77.     Defendants' Products website also promise and expressly warrant that the Products "protect, resurface and waterproof old, damaged wood and concrete . . . provide[ ] long-lasting protection against moisture and the damaging effects of the sun . . . expand and contract along with the substrate while offering excellent scuff resistance for heavy duty foot traffic areas . . . [l]ock[

] down splinters and bridge[ ] dimensionally unstable cracks on old damaged wood surfaces . . . [and are] [f]ormulated to resist growth of mildew and algae on the coating's surface."

78.    Defendants' Product labels and website further promise and expressly warrant that the S-W Product is suitable for "filling deep cracks in concrete or locking down splinters on old structurally sound damaged wood surfaces[,]" and  is a "[a] high build coating" that "protect[s], resurface[s] and repel[s] water on old damaged wood and concrete . . . bridge[s] dimensionally unstable cracks on old damaged sound wood surfaces . . . [s]mooth[s] rough wood and concrete surfaces[, and is e]asy to use, just clean deck or patio surface and apply with a roller."

79.    Defendants' express warranties on their Products limit warranty relief to product replacement or refund of the purchase price. But these warranty limitations violate the Act and fail to meet minimum federal warranty standards; thus, the warranty limitations are not enforceable. *See* §§ 2302(a), 2304(a)(3), 2308(a), and 2308(c). The warranty limitations also fail of their essential purpose and are unconscionable as a matter of law under U.C.C. § 2-302, as adopted by the class jurisdictions.

80.    At the time Defendants issued written warranties for the Products, Defendants knew and had notice that the Products had the propensity to prematurely fail. Defendants' continued misrepresentations and omissions concerning the Products, as well as Defendants' failure to abide by their own written and implied warranties, are "[u]nfair methods of competition in or affecting commerce, and [are] unfair or deceptive acts or practices in or affecting commerce." Accordingly, Defendants' behavior also is unlawful under 15 U.S.C. §§ 2310(b), 45(a)(1).

81.    Plaintiff seeks to recover damages resulting directly from Defendants' breach of their written and implied warranties, and their deceitful and unlawful conduct. Damages include

labor and costs associated with removing the Products and replacing decking structures and other property.

82.    The Act also provides for "other legal and equitable" relief. 15 U.S.C. § 2310(d)(1). Accordingly, Plaintiff seeks reformation of Defendants' written warranty to comport with Defendants' obligations under the Act and with consumers' reasonable expectations. Additionally, Plaintiff seeks to enjoin Defendants from acting unlawfully as further alleged, including discouraging Plaintiff to seek all available remedies.

83.    The Act also provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in the Court's discretion. 15 U.S.C. § 2310(d)(2). Plaintiff intends to seek such an award as prevailing consumers at the conclusion of this case.

**COUNT II**

***Breach of Express Warranty***
***(on behalf of the Nationwide Class or, alternatively, the State Subclasses)***

84.    Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully here.

85.    Defendants' Products labels promise and expressly warrant that they: "[l]ock[] [d]own [s]plinters"; provide "[m]aximum [h]ide"; are specifically intended for application on "[e]xtremely [d]amaged [w]ood or [c]oncrete"; are "[h]igh-build flexible coating[s] designed to protect, resurface, and waterproof old, damaged wood and concrete"; provide "long-lasting protection against moisture and the damaging effects of the sun"; are "[d]esigned to expand and contract along with the substrate while offering excellent scuff resistance for heavy duty foot traffic areas" and "[f]ormulated to resist growth of mildew and algae on the coating's surface"; and can be applied "over existing exterior paint or stained surfaces.".

86. Defendants' Products website also promise and expressly warrant that the Products "protect, resurface and waterproof old, damaged wood and concrete . . . provide[ ] long-lasting protection against moisture and the damaging effects of the sun . . . expand and contract along with the substrate while offering excellent scuff resistance for heavy duty foot traffic areas . . . [l]ock[ ] down splinters and bridge[ ] dimensionally unstable cracks on old damaged wood surfaces . . . [and are] [f]ormulated to resist growth of mildew and algae on the coating's surface."

87. Defendants' Product labels and website further promise and expressly warrant that the S-W Product is suitable for "filling deep cracks in concrete or locking down splinters on old structurally sound damaged wood surfaces[,]" and is a "[a] high build coating" that "protect[s], resurface[s] and repel[s] water on old damaged wood and concrete . . . bridge[s] dimensionally unstable cracks on old damaged sound wood surfaces . . . [s]mooth[s] rough wood and concrete surfaces[, and is e]asy to use, just clean deck or patio surface and apply with a roller."

88. These promises became part of the basis of the bargain between the parties and created collective express warranties that the Products would conform to Defendants' affirmations and promises. Under the terms of these express warranties, Defendants are obligated to replace the Products sold to Plaintiff and the classes, as well as to repair any structural damages the Products caused.

89. Defendants' purported limitations in the warranty, including for the "exclusive remedy" of a refund or replacement, fail of their essential purpose and are procedurally and substantively unconscionable and thus fail under U.C.C. § 2-302, as adopted by the class jurisdictions. Defendants knew or should have known that the Products were susceptible to premature failure, Defendants had unequal bargaining power and misrepresented the Products'

reliability, and the limited remedies unreasonably favor Defendants and fail Plaintiff's and the Classes' reasonable expectations for guaranteed satisfaction concerning product performance.

90.    Defendants breached their express warranties by supplying the Products in a condition that does not satisfy warranty obligations and by failing to compensate Plaintiff and the Classes for damages caused by the Products.

91.    Plaintiff has complied with the warranty terms, including applying the Product in accordance with Defendants' instructions and maintaining residence in their homes. Plaintiff has made a demand upon Defendants to perform under the warranty terms, but Defendants have failed to comply with those terms.

92.    As a direct and proximate result of the breach of express warranties, Plaintiff has suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial, including repair and replacement costs and damages to other property.

## COUNT III

### *Breach of the Implied Warranty of Merchantability*
### *(on behalf of the Missouri Class)*

93.    Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully here.

94.    Defendants are in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and selling the Products, which have been applied to Plaintiff's decks and other similar structures, as well as the decks of the Classes. Defendants impliedly warranted to Plaintiff, to Plaintiff's agents, and to the Classes, that the Products were of a certain quality, free from defects, fit for the ordinary purpose of resurfacing decks and similar structures, and suitable for providing protection to deck structures form harsh weather conditions and lasting longer than ordinary deck paints or stains.

95.     But the Products were unfit for ordinary use and were not of merchantable quality as warranted by Defendants because the Products are defective and have the propensity to crack, peel, flake, chip, bubble, pucker, separate, and generally degrade. Before purchase, Plaintiff and the classes could not have readily discovered that the Products were not merchantable to resurface decks, were not of the same quality as those generally acceptable in the trade, and did not conform to the quality previously represented.

96.     Defendants have failed to provide adequate remedies under their limited warranties, which have caused those warranties to fail of their essential purpose, thereby permitting remedies under these implied warranties.

97.     Defendants have not sufficiently (meaning specifically and conspicuously) disclaimed the implied warranty of merchantability.

98.     The purported limitations in Defendants' warranties, including limiting the exclusive remedy to a refund or replacement, are procedurally and substantively unconscionable and thus fail under U.C.C. § 2-302, as adopted by the states listed in this Count. Defendants knew or should have known that the Products are susceptible to premature failure, Defendants had unequal bargaining power and misrepresented the Products' reliability, and the limited remedies unreasonably favor Defendants and fail Plaintiff's (and the classes') reasonable expectations for product performance.

99.     Plaintiff gave Defendants actual or constructive notice of the breaches of these warranties, and Defendants have failed to cure these breaches.

100.    As a direct and proximate result of the breaches of these implied warranties, Plaintiff and the classes have suffered damages, injury in fact and ascertainable loss in an amount to be determined at trial, including repair and replacement costs and damages to other property.

101.     Plaintiff demands judgment against Defendants for compensatory damages for herself and each class member, for the establishment of a common fund, plus additional remedies as this Court deems fit.


## COUNT IV

### *Unjust Enrichment*
### *(on behalf of the Nationwide class or, alternatively, the State Subclasses)*

102.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully here.

103.     As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase of the Products by Plaintiff and the classes.

104.     Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendants' misconduct, Plaintiff and the classes were not receiving products of the quality, nature, fitness, or value that had been represented by Defendants, and that reasonable consumers expected.

105.     Defendants have been unjustly enriched by their fraudulent and deceptive withholding of benefits to Plaintiff and the Classes at the expense of these parties.

106.     Equity and good conscience militate against permitting Defendants to retain these profits and benefits.

107.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and class members suffered injury and seek an order directing Defendants' disgorgement and the return to Plaintiff and the classes of the amount each improperly paid to Defendants.

**COUNT V**

*Violation of the Missouri Merchandising Practices Act, Mo. Stat. § 407.010, et seq.*
*(on behalf of the Missouri State Subclass)*

108.    Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully here.

109.    Plaintiff brings this count individually and on behalf of the Missouri Class.

110.    The MMPA prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."

111.    Defendants' misrepresentations and material omissions regarding the defective nature of the Products constitute deceptive, fraudulent, false, and unfair acts in violation of the MMPA.

112.    Defendants' deceptive or unfair practices took place in the course of trade or commerce.

113.    Defendants intended for Plaintiff and the Missouri State Class to rely on these deceptive and unfair practices when they purchased the Products.

114.    Plaintiff and the Missouri Class have suffered injuries in fact and actual damages, including property damage, resulting from Defendants' knowing and willful violations of the MMPA as alleged here. These injuries are of the type that the MMPA was designed to prevent, and are the direct and proximate result of Defendants' unlawful conduct.

115.    Plaintiff and the Missouri Class were injured as a result of Defendants' conduct in that they overpaid for the Products and did not receive the benefit of their bargain, and as a result

of the failures of the Products their properties have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

116.    Plaintiff and the Missouri Class seek punitive damages and an award of attorneys' fees pursuant to Mo. Stat. § 407.025(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this case be certified and maintained as a class action and for judgment to be entered upon Defendants as follows:

      a.     For economic and compensatory damages on behalf of Plaintiff and the classes;

      b.     For restitution;

      c.     For actual damages sustained and for trebled damages, as permitted by relevant consumer fraud statutes;

      d.     For punitive damages, as otherwise applicable;

      e.     For reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

      f.     For such other and further relief as this Court deems just and appropriate.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims so triable.

Dated: November 30, 2017

By:     */s/ Thomas A. Muzilla*
Thomas A. Muzilla (OH 0037662)
THE MUZILLA LAW FIRM, LLC
2996 Kingsley Road
Cleveland, Ohio 44122
Telephone: (216) 401-8607
E-mail: tom@muzillalaw.com

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
McCUNE WRIGHT AREVALO LLP
555 Lancaster Avenue
Berwyn, PA 19312
Telephone: (610) 200-0580
jgs@mccunewright.com
mds@mccunewright.com
jbk@mccunewright.com

Bryan Clobes
CAFFERTY CLOBES MERIWETHER & SPRENGEL
1101 Market Street
Suite 2650
Philadelphia, PA 19107
Telephone: (215) 864-2800
Facsimile: (215) 864-2810
E-mail: bclobes@caffertyclobes.com

Daniel O. Herrera
CAFFERTY CLOBES MERIWETHER & SPRENGEL
30 N LaSalle St.
Suite 3200
Chicago, IL 60602
Telephone: (312) 782-4880
E-mail: dherrera@caffertyclobes.com

***Attorneys for Plaintiffs***